UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Jose Antonio Perez, *Petitioner*, | Civil No. 3:07cv335 (JBA) Criminal No. 3:02cr7 (JBA) |
| *v.* | |
| United States of America, *Respondent.* | January 6, 2010 |

RULING ON PETITIONER'S MOTION TO VACATE,
SET ASIDE, OR CORRECT SENTENCE

Petitioner Jose Antonio Perez was convicted by a jury on April 14, 2003 of five crimes arising from his role in the 1996 murder-for-hire of Teddy Casiano. He has moved pursuant to 28 U.S.C. § 2255 to set aside four of these convictions—conspiracy to commit murder for hire, two counts of interstate travel facility murder for hire, and VICAR murder[1]—for which he is currently serving four concurrent life sentences. Mr. Perez claims that he was afforded unconstitutionally ineffective assistance of counsel because his trial attorneys failed to let him testify, do necessary investigations, adequately cross-examine Government witnesses, or call an alibi witness. For the reasons discussed below, Petitioner's motion will be denied.

---

[1] Petitioner, who is represented by counsel, appears not to challenge his conviction on the fifth count, causing death by use of a firearm during a crime of violence (*see* Petition [Doc. # 1] at ¶ 17), for which he was sentenced to five years, to run consecutively with his life sentences. In any event, the Court's conclusion that Petitioner's ineffective-assistance-of-counsel claim lacks merit and does not entitle him to a hearing applies with equal force to his conviction for this crime.

I.      Standards

28 U.S.C. § 2255 provides:

(a)   A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

(b)   Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto. . . .

28 U.S.C. § 2255.  Thus, to determine whether Petitioner is entitled to a hearing,

[the Court] look[s] "primarily to the affidavit or other evidence proffered in support of the application in order to determine whether, if the evidence should be offered at a hearing, it would be admissible proof entitling the petitioner to relief."  In this regard, "[m]ere generalities or hearsay statements will not normally entitle the applicant to a hearing, since such hearsay would be inadmissible at the hearing itself."  Rather, "[t]he petitioner must set forth specific facts which he is in a position to establish by competent evidence."

*LoCascio v. United States*, 395 F.3d 51, 57 (2d Cir. 2005) (citations omitted).

Here, Petitioner seeks to have the Court vacate his sentence because his trial

attorneys, Norman Pattis and Diane Polan, afforded him unconstitutionally ineffective

assistance of counsel.  To prevail on this claim he

must meet a two-part test.  "First the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

2

Thus, "the defendant must show that counsel's representation fell below an objective standard of reasonableness" measured "under prevailing professional norms." *Id.* at 688. "Actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance, and a court may not use hindsight to second-guess counsel's tactical choices." *McKee v. United States*, 167 F.3d 103, 106 (2d Cir. 1999) (internal citations and quotation marks omitted).

To meet the second prong, "the defendant must show that [counsel's] deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. "In evaluating the prejudice component of *Strickland*, a court must determine whether, absent counsel's deficient performance, there is a reasonable probability that the outcome of the proceeding would have been different. Unlike the performance determination, the prejudice analysis may be made with the benefit of hindsight." *McKee*, 167 F.3d at 106–07 (internal citations and quotation marks omitted).

*United States v. Gonzalez*, 407 F. Supp. 2d 375, 380–81 (D. Conn. 2005); *see also Henry v. Poole*, 409 F.3d 48, 62–64 (2d Cir. 2005) (providing extended discussion of two-prong standard for ineffective assistance of counsel claim under *Strickland*). A petitioner's failure to demonstrate either counsel's deficient performance or resulting prejudice is fatal to his claim. *See Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.").

To establish his right to a hearing Petitioner "must set forth specific facts" that, if true, demonstrate both that his attorneys' performance "fell below an objective standard of

reasonableness," and that "absent counsel's deficient performance, there is a reasonable probability that the outcome of the proceeding would have been different." *LoCascio*, 395 F.3d at 57; *see also Puglisi v. United States*, 586 F.3d 209, 213–16 (2d Cir. 2009) (providing extended discussion of standard petitioner must meet to show entitlement to evidentiary hearing, and applying that standard to a claim of ineffective assistance of counsel).  Because he fails to meet this standard, Petitioner is not entitled to a hearing.

II.    Discussion[2]

A.    Summary of Petitioner's claims

Petitioner asserts that he was afforded ineffective assistance of counsel because his trial attorneys (1) prevented him from exercising his right to testify on his own behalf on a number of matters;[3] (2) failed to obtain the cell phone records of the victim, Casiano, or the Government's primary witness, Oliguibeth Berrios, which Mr. Perez states would have demonstrated that Berrios, and not Petitioner, lured Casiano to the scene of his murder by

---

[2] The Court assumes the reader's familiarity with the factual and procedural background of this case.  *See generally United States v. Perez*, No. 3:02cr7(JBA), 2004 WL 2472275, 2004 U.S. Dist. LEXIS 22121 (D. Conn. Nov. 2, 2004) (denying motion for judgment of acquittal), *aff'd*, 414 F.3d 302 and 138 F. App'x 379 (2d Cir. 2005), *cert. denied*, 547 U.S. 1002 (2006).

[3] Although Petitioner never informed the Court of his wish to testify at trial even after the Court expressly informed him of his right to do so (*see* Trial Tr., Vol. XII, at 2785–86 (explaining right to testify and confirming that Petitioner understood the Court's admonition that "[y]ou should listen very carefully to your lawyer on the pros and cons of testifying, but ultimately it is your decision")), in the Second Circuit, "absent something in the record suggesting a knowing waiver, silence alone cannot support an inference of . . . a waiver" or forfeiture of the right to testify, *Chang v. United States*, 250 F.3d 79, 84 (2d Cir. 2001).

beeping Casiano and having him call and then visit Perez Automotive, Inc., the auto shop that Petitioner operated with his brother; (3) did not elicit testimony from Vivian Perez that "Pito" rather than Petitioner beeped Casiano on the day of the murder; (4) failed to investigate the "likely" criminal records of "the cooperating [G]overnment witnesses"; (5) failed to investigate or cross-examine five Government witnesses as to their past criminal histories; and (6) did not call an alibi witness, Elba Lazado, who would have testified that she was with Mr. Perez during Casiano's murder.  Petitioner avers that had he been called to testify, he would have testified to the following:

¶    Berrios, alone, arranged Casiano's murder.  Without Petitioner or his brother's assistance, Berrios was engaged in the drug trade through suppliers based in Puerto Rico.  Berrios "planned to kill Teddy Casiano[ b]ecause Teddy Casiano had kidnapped [Berrios] and robbed [him]" of drugs and money that Berrios had obtained through his independent drug-trading activities, not through Petitioner and his brother.  (Perez Aff. [Doc. # 8-1] at ¶¶ 4–5.)

¶    "Berrios recruited some of his friends and their associates in New York City to plot and kill Teddy Casiano" knowing that Casiano would not recognize them.  (*Id.* at ¶ 6.)  Berrios also told Petitioner that he "planned on beating up Teddy for what he did to him."  (*Id.* at ¶ 10.)

¶    Berrios cooperated with the Government not only "to save his own neck" but also because "he was angry with [Petitioner] and [his] brother Wilfredo because [Berrios] . . . saw that both Wilfredo and [Petitioner] were still friends with Teddy Casiano" despite Casiano having kidnapped Berrios.  Berrios "felt [Petitioner and Wilfredo] betrayed him," and also suspected that Wilfredo "alerted" Casiano as to the drugs and money Casiano stole from Berrios when he kidnapped Berrios.  (*Id.* at ¶ 7.)

¶    Berrios and his associates planned to kidnap Casiano and decided to do so near Perez Auto after seeing Casiano's car being repaired there.  Petitioner "later learned that they killed Teddy after he left the garage," and Berrios bragged about having killed Casiano.  (*Id.* at ¶¶ 8, 11.)

5

¶   Petitioner was innocent and "did not have anything to do with the murder of Teddy Casiano." (*Id.* at ¶ 9.)

¶   Berrios told Petitioner and his brother that "he beeped Teddy numerous times over the two days [preceding Casiano's murder] . . . to try to lure Teddy to the shop." (*Id.* at ¶ 12.)

¶   Prior to the murder, Perez Automotive employee "Pito," and not Petitioner, beeped Casiano because Casiano had called looking for him. (*Id.* at ¶ 13.) Petitioner had a beeper code, "33," that did not appear after the Perez auto shop phone number, which had been "locked in" to Casiano's beeper. (*Id.* at ¶ 14.) Petitioner "never beeped Teddy on the day he was murdered." (*Id.* at ¶ 15.)

¶   Contrary to Maritza Alvarez's testimony, the message on the answering machine at the Alvarez-Casiano household, which was left on the day Casiano was killed, which identified the caller as Petitioner, and which instructed Casiano to come to Perez Automotive, did not bear Petitioner's voice. (*Id.* at ¶ 16.)

The Court addresses each of Petitioner's asserted grounds in turn, and concludes that Petitioner does not demonstrate that he was afforded unconstitutionally ineffective assistance of counsel and therefore is not entitled to an evidentiary hearing on his petition.

B.   Risks of calling Petitioner to testify

At the outset, the Court observes that regardless of the testimony Petitioner avers he would have offered, his decision to testify would have permitted the Government to cross-examine him about his extensive criminal history and activities on cross-examination. *See, e.g., United States v. Payton*, 159 F.3d 49, 58 (2d Cir. 1998) ("When a defendant offers an innocent explanation he 'opens the door' to questioning into the truth of his testimony, and the government is entitled to attack his credibility on cross-examination. . . . A defendant has no right to avoid cross-examination into the truth of his direct examination, even as to

matters not related to the merits of the charges against him."). Especially where, as here, the witnesses that Petitioner's proposed testimony would attempt to impeach had already been subject to extensive cross-examination and impeachment, and where the Petitioner himself would be "highly impeachable" given both his extensive "criminal history" and "strong motive[] to lie," counsel's determination not to call Petitioner was objectively reasonable. *See Sacco v. Cooksey*, 214 F.3d 270, 274 (2d Cir. 2000). On this basis alone, Petitioner's arguments that his attorneys' failure to call him to testify constitutes ineffective assistance of counsel must be rejected. Nonetheless, the Court considers the testimony he avers he would have given, and concludes that even considered together with his other claims of his attorneys' failures, Petitioner has not shown his entitlement to relief.

C.      Evidence regarding who beeped Casiano on the day he was killed

Petitioner avers that his testimony would have challenged the evidence that on the day of the murder he both beeped Casiano and left a message on Casiano's answering machine in an attempt to locate Casiano and lure him to the auto shop. Alvarez testified that while lying in bed in the apartment she shared with Casiano, the land-line phone rang, she did not answer the phone and heard a message being recorded on the answering machine. Alvarez further testified that listening to the message she heard Petitioner's voice—which she knew was Petitioner's voice because "I've heard Tony Perez's voice before. I know what he sounds like" (Testimony of Maritza Alvarez, Trial Tr., Vol. IX, at 1993)—and that in the message Petitioner said "'Teddy, it's me, Tony.' . . . 'Can you give me a call, we need you to

7

come down to the shop.'" (*Id.* at 1995).  She then testified that Casiano called the apartment land-line and, because she was not available, he left a message telling her that he was going to the auto shop "'because Tony beeped me.'" (*Id.* at 1997.)[4]

Petitioner's averments that he did not beep Casiano and that it was not his voice on the machine[5] do not directly contradict Alvarez's testimony that the caller who left a message on the Casiano–Alvarez answering machine identified himself as Petitioner or that Casiano identified Petitioner as the person who beeped him.  This self-identification of the caller as "Tony" clearly supports an inference that Petitioner "lure[d] [Casiano] to Perez Auto" as part of his involvement in the murder conspiracy.  *United States v. Perez*, No. 3:02cr7(JBA), 2004 WL 2472275, *2, 2004 U.S. Dist. LEXIS 22121, *7 (D. Conn. Nov. 2, 2004), *aff'd*, 138

---

[4]   Petitioner also avers that his proposed testimony that he did not beep Casiano would contradict David Erazo's testimony that he did in fact beep Casiano.  (Perez Aff. at ¶ 15.)  Perez mischaracterizes Erazo's testimony.  In fact, in ruling on an objection by Petitioner's trial counsel the Court ruled that Erazo could not testify that Casiano told him on the morning of his murder that "Tony's beeping me like crazy" because it was a hearsay statement not subject to a hearsay exception.  (*See* Trial Tr., Vol. X, at 2093.)  Thus, Erazo testified only that on the morning of Casiano's murder, Casiano's beeper went off, and that in response to that beep Casiano stated that he was going to the Perez auto shop.  (*Id.* at 2096–97.)  Erazo did not identify Petitioner as the person who beeped Casiano.

[5]   Petitioner also asserts that Alvarez never told the police officers investigating Casiano's death about the phone message, and that it is "very suspicious" that the tape containing the phone message was never located.  (Perez Aff. at ¶ 16.)  Alvarez, however, testified as to both of these issues, and under cross-examination by Petitioner's counsel Alvarez also testified that she and Casiano had only had the land-line phone number for two months and that Petitioner had never called it before.  (*See* Alvarez Testimony, Trial Tr., Vol. IX, at 2002 & 2022–23 & 2028–32.)  *See also infra* note 6.

F. App'x 379 (2d Cir. 2005).  But the other evidence—even excluding evidence that Petitioner beeped Casiano—could support the jury's conclusion of Petitioner's guilt:

> The evidence that Jose Antonio Perez discussed an escape route with the contract killers, *called* Casiano to lure him to Perez Auto, and offered the use of his Cadillac as a getaway car, provided a sufficient basis for the jury to find that Jose Antonio Perez had knowledge of both aims of the § 1958 conspiracy, namely, to commit the murder for hire of Teddy Casiano by interstate travel and by the use of an interstate facility, and that he willingly participated in that conspiracy with the intention of aiding in the accomplishment of its goals.

*Id.* (emphasis added); *see also id.*, 2004 WL 2472275, *5, 2004 U.S. Dist. LEXIS 22121, *15 ("[t]here was evidence at trial from which a jury could conclude that Jose Antonio Perez used a land line phone from Perez Auto to call Teddy Casiano").  Therefore, Petitioner cannot demonstrate prejudice caused by his attorneys' decision not to call him to give testimony relating to beeps received by Casiano, testimony contradicting Alvarez's identification of Petitioner's voice,[6] or explanations that "Pito" beeped Casiano because

---

[6] Alvarez's testimony that Petitioner left a message on the Casiano–Alvarez answering machine that morning asking Casiano to come to the auto shop was corroborated by Mario Lopez's testimony that the "owner" of the auto shop—who he believed was Petitioner—made calls from the auto shop's office while the players were assembling for the hit.  The Court concludes that Petitioner's proposed testimony would thus "'have had an isolated, trivial effect,'" not "'a pervasive effect on the inferences to be drawn from the evidence.'"  *See Lynn v. Bliden*, 443 F.3d 238, 247–48 (2d Cir. 2006) (quoting *Strickland*, 466 U.S. at 695–96).  Because at least three witnesses—Lopez, Alvarez, and Berrios—identified Petitioner as the person who beeped Casiano, that fact was established with some strength, *see United States v. Perez*, No. 3:02cr7(JBA), 2004 WL 2472275, *2 n.3, 2004 U.S. Dist. LEXIS 22121, *6 n.3 (discussing and quoting testimony of Mario Lopez), such that Petitioner's inability to testify that he did not beep Casiano does not establish prejudice, *see Lynn*, 443 F.3d at 247–48.

Casiano had called the auto shop looking for "Pito,"[7] and that he could not have beeped Casiano because his beeper code did not appear on Casiano's beeper.[8]

### C.     Attacks on Berrios

The gravamen and primary focus of Mr. Perez's petition and affidavit is that his attorneys failed to emphasize that Berrios, who Petitioner describes as "the chief [G]overnment[] cooperating witness" (Perez Aff. at ¶ 4) and who testified about Petitioner's participation in the planning of Casiano's murder, lacked credibility. Petitioner argues that because Berrios's testimony "was the cornerstone of the [G]overnment's case[, i]t was crucial . . . to attack [Berrios's] credibility." (*Id.* ¶ 17.) However, Berrios testified to many of the facts to which Mr. Perez avers he would have testified, and Mr. Pattis's cross-examination of Berrios was extensive in scope and covered the topics on which Mr. Perez's petition is grounded.

Berrios's testimony on cross-examination addressed the points Petitioner claims were omitted: Berrios's criminal history, cooperation agreement with the Government,

---

[7] Petitioner's proposed testimony that "Pito" beeped Casiano would contradict other portions of his own proposed testimony—namely, that Berrios beeped Casiano.

[8] Petitioner avers that he would have testified that "[w]henever [he] beeped anyone [he] would used [his] code, which is 33," that Berrios's code was 888, and that they used these codes to identify themselves as the caller when they beeped others. (Perez Aff. at ¶ 14.) Berrios, however, also testified that his code was 888, and that Petitioner also had a code, although Berrios did not remember it. (Berrios Testimony, Trial Tr., Vol. VIII, at 1853.) Thus, Petitioner's assertion that "[d]efense counsel failed to ever bring before the jury the fact that the defendants and [G]overnment cooperating witnesses utilized a code when beeping each other" (Mem. Law [Doc. # 8-2] at 7) is factually incorrect.

motivation to help convict Petitioner to avoid prosecution, hatred of Casiano because Casiano had kidnapped and humiliated him, and anger at Petitioner and his brother for remaining friendly with Casiano despite the kidnapping.[9]

Mr. Perez's petition also asserts that his attorneys failed to cross-examine Berrios "to establish that he lied to Judge Squatrito at his sentencing hearing and to the probation officer" (Petition at 5) and failed to explore the phone calls Berrios made to "the case agent" (that is, DEA Special Agent Christopher Matta) that would have demonstrated that Berrios believed that the Government exercised "total control over him" (*id.* at 6). These are simply mischaracterizations of Berrios's testimony; Mr. Pattis cross-examined Berrios on both these issues.[10]

---

[9] Mr. Pattis cross-examined Berrios as to each of these matters. (*See, e.g.*, Berrios Testimony, Trial Tr., Vol. VIII, at 1808 (discussing his arrest and guilty plea for "for [his] role in the Perez drug operation," and resulting sentence of "11 plus years"); *id.* at 1796 (agreeing that he has talked with DEA Special Agent Christopher Matta "about the possibility of being set free after this trial" and "the possibility of getting a walk"); *id.* at Vol. IX at 1870–1900 (discussing "courtship" between Matta and himself); 1898 (agreeing that he understood Matta was "looking for . . . Tony and Wilfredo Perez"); *id.* at Vol. VIII at 1800 (agreeing that in testifying against Petitioner and his brother he "hope[s] in this case to get away with murder"); *id.* at 1801 (agreeing that his understanding is that if he testifies truthfully he will not be prosecuted for Casiano's murder); *id.* at 1750 (agreeing that he never liked Casiano and that after the kidnapping he began to "hate" Casiano); *id.* at Vol. IX at 1936 (agreeing that Casiano's murder "maybe" constitutes "revenge" for Casiano having kidnapped him); *id.* at 1752 (agreeing that he was "really mad" and felt "betray[ed]" when Petitioner and his brother met and remained friends with Casiano following the kidnapping); *id.* at 1807 (agreeing that "[b]ut for [his] acts, . . . Casiano could well be alive today"); *id.* at 1860–61 (agreeing that he hid drugs in his friend's apartment after receiving them through Fed Ex).)

[10] *See, e.g.*, Berrios Testimony, Trial Tr., Vol. IX, at 1874 (agreeing that he has "sometimes lied in court proceedings about the Perez case"); *id.* at 1876–77 (agreeing that

Petitioner further avers that Berrios "recruited some of his friends and their associates in New York City to plot and kill Teddy Casiano," and that Berrios "brought these people to Connecticut because he knew Teddy Casiano or his people would not recognize any of them." (Perez Aff. at ¶ 6.)  Berrios himself testified explicitly that he, with assistance from Santiago "Jay" Feliciano, went to New York City to find and hire people who would be willing to kill Casiano, and that he (Berrios) brought these people to Connecticut,[11] so Petitioner cannot demonstrate that the jury was unaware of these matters.  Second, Berrios's motivation for finding contract killers from out-of-state is irrelevant to Petitioner's conviction, and the unrebutted evidence undisputed by Petitioner that the contract killers were unfamiliar with the area or its local roads is the factual basis for one aspect of Petitioner's involvement in the conspiracy—his suggestion of particular routes the contract killers could take between the auto shop and the place where they ambushed Casiano.

Finally, Petitioner avers that Berrios bragged to others about killing Casiano; that Berrios and the contract killers had been "in Connecticut for several days with his New York friends looking for a way to kidnap" Casiano; that before the murder Berrios "told

---

when he "told [Judge Squatrito], or the probation officer[,] 'I just moved the stuff into the Ramirez home shortly before, but I really didn't know what was in there,' that was a lie"); *id.* at 1900 (agreeing that Messrs. Ring and Matta told him "that if [he] didn't participate [he] could be charged in the murder of Teddy Casiano"); *id.* at 1929 (agreeing that he "maybe" had "[t]oo many [conversations with Matta] to remember").  *See also supra* note 9 (citing additional testimony of Berrios regarding his cooperation with the Government).

[11]  *See* Berrios Testimony, Trial Tr., Vol. VIII, at 1755–58 (discussing going to New York with Feliciano to hire contract killers); *id.* at 1816–18 (same); *id.* at 1968–69 (agreeing that he brought contract killers to Connecticut and "showed them how to escape").

[Petitioner] that he planned on beating up Teddy for what he did to him"; that having seen "Teddy's Cadillac" at the Perez auto shop, Berrios and the contract killers "waited for Teddy to pick up his car"; and that Petitioner "later learned that they killed Teddy after he left the garage." (Perez Aff. at ¶ 8, 10–11.)  This proposed testimony is not at odds with Berrios's testimony[12] and does not bear directly on the evidence of Petitioner's involvement in the conspiracy, on which basis Petitioner's conviction rests.

Because Mr. Perez cannot demonstrate prejudice flowing from either his failure to testify or Mr. Pattis's cross-examination of Berrios, Mr. Perez's assertions regarding Berrios do not provide a basis on which to grant his petition.

D.    Additional attacks on counsel's efforts

1.    *Investigation of cell phone records of Berrios and Casiano*

Petitioner argues that he suffered from ineffective assistance of counsel because his trial attorneys failed to obtain the cell phone records of Berrios and Casiano, which Mr. Perez asserts "may have been helpful to show" that Berrios had beeped Casiano multiple

---

[12]   Berrios testified that he wanted revenge for Casiano having kidnapped him (Berrios Testimony, Trial Tr., Vol. IX, at 1936) and that the murder itself went according to the plan devised by Berrios and the contract killers: while Berrios and Feliciano waited on the side of the Perez auto shop in Petitioner's car, Gonzalez and Lopez followed Casiano away from the shop, killed him, returned to the shop, and waved to Berrios; Berrios and Feliciano then followed Gonzalez and Lopez onto the highway where they eventually stopped so that Feliciano could take and dispose of the bike and Gonzalez could dispose of the gun; the four of them then returned to New York City, whereupon Berrios called Wilfredo Perez (not Petitioner) to inform him that Casiano had been killed (*id.* at Vol. VIII at 1780–84).  *See also supra* notes 9 & 10.

times in the two days prior to his murder, and that Berrios "was beeping Teddy Casiano on his own to lure him to the shop and not me[,] as [Berrios] falsely testified to." (Perez Aff. at ¶¶ 12, 20.) Mr. Perez does not proffer any evidence that Berrios and Casiano even had cell phones when Casiano was murdered in May 1996. The testimony instead supports an inference that Berrios and Casiano had beepers, not cell phones: Alvarez's testimony only suggests that Casiano had a beeper and a land-line he shared with her, and Berrios testified that when Casiano wanted to get in touch with him, he beeped him, not called him.[13] Even if Berrios had a cell phone, and even if Berrios *beeped* Casiano's from his cell phone in the two days prior to Casiano's murder, that fact would not contradict the basis for a conclusion that Petitioner "used a land line" to *call* Casiano, *Perez*, 2004 WL 2472275, *5, 2004 U.S. Dist. LEXIS 22121, *15, including Mario Lopez's testimony that the "owner" of the Perez auto shop—who, from Lopez's description, jurors could infer was Petitioner—made calls from the phone located in the auto shop office on May 23rd and 24th to locate Casiano and lure him to the shop, and announced on the day of Casiano's murder that "he was going to make a few phone calls to try to locate the victim" (Testimony of Mario Lopez, Trial Tr., Vol. VI, at 1297). Having failed to demonstrate a factual basis for his belief as to the contents of documents his attorneys failed to obtain, Petitioner has failed to make out a claim of

---

[13] Alvarez Testimony, Trial Tr., Vol. IX, at 2028–30 (testifying that in attempting to get in touch with Casiano, Alvarez beeped him); Berrios Testimony, Trial Tr., Vol. VIII, at 1662–63 (testifying that Casiano beeped Berrios when luring him to be kidnapped).

14

ineffective assistance of counsel as to his attorneys' investigation of the telephone records of Berrios and Casiano.

          2.       *Investigation into and cross-examination as to Government witnesses' criminal histories*

      Mr. Perez argues that his attorneys should have investigated the backgrounds of five of the Government's cooperating witnesses[14] because they "all . . . most likely had criminal records," and that the attorneys "also failed to cross-examine [them] about their past [c]riminal histories."   (Perez Aff. at ¶¶ 17–18.)   Through both cross-examination by Petitioner's and co-defendants' trial counsel as well as on direct examination, the Government's main witnesses, Berrios and Mario Lopez, testified about their criminal histories, and Francisco Colon admitted that he was involved in multiple kidnappings,

---

[14]  Specifically, Berrios, Alvarez, David Erazo, Mario Lopez, and Fernando Colon.

including of Berrios.[15]  Petitioner has thus failed to provide any factual basis on which to conclude that his attorneys' performance at trial in this regard was unreasonable or deficient.

### 3.       Decision not to call Elba Lazado to testify

Petitioner argues that his attorneys' efforts fell below the constitutional minimum because they failed to call Elba Lazado, who Petitioner avers "would have confirmed that [he] was with her before, during and after Teddy Casiano was murdered," at the Hour Glass Café. Aside from his placing a phone call to Casiano at the home Casiano shared with Alvarez on the day of Casiano's murder, there was no evidence that Petitioner's participation in the conspiracy to murder Casiano involved his presence at Perez Automotive at the time of Casiano's murder.  Therefore, Petitioner's attorneys' determination not to call Lazado to testify about his whereabouts at that time demonstrates no prejudice because the purported fact of his presence at the Hour Glass Café when the murder took place would not contradict the evidence of his participation in the murder conspiracy.

---

[15]  *See, e.g.*, Testimony of Mario Lopez, Trial Tr. Vol. VI, at 1227–50 (testifying that he has "been convicted of several crimes"; testifying as to extensive criminal history beginning in 1982 with an arrest for disorderly conduct; listing criminal history as including reckless endangerment; having assisted his associates in murder, having stolen cars and motorcycles, and giving false statements in applying for driver's license; describing his profession prior to arrest as being "a professional auto thief"); *id.* at 1354–61 (cross-examination of Lopez by Jeremiah Donovan, counsel for co-defendant Raymond Pina, as to Lopez's criminal history); Testimony of Fernando Colon, Trial Tr. Vol. X, at 2298–2305 (testifying on direct examination that he has immunity from prosecution on the basis of trial testimony and as to his involvement in kidnapping Berrios); *id.* at 2321, 2326 (testifying on cross-examination by Norman Pattis that Colon kidnapped Berrios and was also involved in other kidnappings). *See also supra* notes 9 & 10 (citing Mr. Pattis's cross-examination of Berrios as to his criminal history).

        **4.**     *Decision not to call Casiano family members, medical expert, or "Moe"*
        *to testify*

Petitioner argues that his attorneys should have called members of Casiano's family to testify about the close relationship between the Perezes and Casianos; that they should have had him "examined by an expert who deals with issues of drug abuse"; and that they should have "[u]se[d] the contradictory statements of 'Moe' and the body shop person as to work done on Teddy Casiano's car."  (Petition at 5.)  These "should-have" claims lack any factual support—that is, what the Casiano family members would have said, what the expert would have opined,[16] and what Moe's contradictory testimony would be so as to give any support to a conclusion that Petitioner's attorneys' decisions not to call these witnesses fell below an objective standard of reasonableness or resulted in any prejudice.

        **5.**     *Decision not to impeach U.S. DEA Special Agent Christopher Matta*
        *with his testimony from Florida case*

Petitioner asserts that his attorneys failed to "[u]tilize" the cross-examination by a "public defender in Florida" of DEA Special Agent Christopher Matta in another proceeding. Petitioner has failed to provide any substantive factual elaboration of what is contained in this cross-examination in the Florida case, on which basis the Court might conclude that his

---

[16]    Ms. Polan, Petitioner's attorney, elicited testimony from Vivian Perez—Petitioner's sister-in-law and an employee at Perez Automotive—that Petitioner was addicted to heroin (Testimony of Vivian Perez, Trial Tr., Vol. XII, at 2766–67), and during her closing argument Ms. Polan argued the severity of Petitioner's addiction based on the medical records exhibits, which disclosed Petitioner's drug-induced hallucinations (Closing Argument, Trial Tr., Vol. XIV, at 3144–45).

attorneys' cross-examination of Agent Matta in Petitioner's trial did not elicit sufficient impeachment material.  Both Mr. Pattis and counsel for Pina vigorously cross-examined Agent Matta at Petitioner's trial, eliciting his admissions that he engages in "strategic deception" of people he interviews—including, in this case, Pina—and testified that "I lied, yes," when he told Pina that he had found the murder weapon when in fact he had not. (Trial Tr., Vol. XI, at 2574; *see generally id.* at 2574–75 (cross-examination by Pina's counsel), 2575–77 (cross-examination by Mr. Pattis regarding "strategic deception").) Since Agent Matta's "strategic deception" was before the jury, the Court, lacking any record from Petitioner of what Agent Matta's Florida testimony would materially add to his impeachment, concludes that Mr. Pattis's cross-examination of Mr. Matta was not unreasonable.

### 6.    *Advice to reject plea bargain offered prior to trial*

Petitioner states that his trial attorneys advised him to reject the plea bargain proffered him prior to trial (Petition at 6), presumably an argument that such advice was unconstitutionally ineffective in light of his conviction and four concurrent life sentences. However, Petitioner does not specify what the terms of the offered plea bargain were, what advice his counsel gave him, or the basis on which such advice was unconstitutionally incompetent.  He does not state that his attorneys misrepresented the risks of going to trial, provided him with too little or erroneous legal analysis, or otherwise failed to advise him properly.  Petitioner thus provides no basis on which to conclude that his attorneys' advice

to reject a plea bargain in any way fell below an objective standard of reasonableness. *See Puglisi*, 586 F.3d at 215 ("a petitioner seeking a hearing must proffer arguably credible evidence of a prima facie case that, but for counsel's improper advice, the petitioner would have accepted the plea offer").

### E.  Protestations of innocence

Petitioner also avers that he would have testified to his innocence, that he "did not pay anyone any money," that he did not "[partake] in any planning of the Casiano murder," and that he learned of Casiano's murder only after it happened.  (Perez Aff. at ¶¶ 9, 11.) These protestations of innocence and non-involvement do not demonstrate prejudice because they lack any factual specificity challenging the evidence on which Petitioner was convicted.  To the extent he challenges evidence that he paid $6,000 to the contract killers, his challenge is misplaced because the trial evidence is consistent with his proposed testimony: Berrios testified that Wilfredo Perez, not Petitioner, gave Berrios $6,000 with the intent that Berrios give it to the contract killers following the murder.  (*See* Berrios Testimony, Trial Tr., Vol. VIII, at 1779.)  Since Petitioner's conviction does not rest on evidence of his having paid anyone, Petitioner has not cast any doubt on the facts in evidence relating to his involvement in the conspiracy to murder Casiano.  Petitioner therefore fails to demonstrate any prejudice on this basis, and these averments thus provide no ground on which to find that Petitioner was afforded unconstitutionally ineffective assistance of counsel.

III.    Conclusion

For the foregoing reasons, Petitioner has neither made out any claim of ineffective assistance of counsel, nor demonstrated the need to hold an evidentiary hearing, and therefore his Motion to Vacate, Set Aside, or Correct Sentence [Doc. # 1] is DENIED.

The Clerk is directed to close this case.


IT IS SO ORDERED.


          /s/
Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 6th day of January, 2010.